# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

JOHN JACKSON GARRISON,     )
                               )
         Petitioner,      )
                               )
v.                            )      **Case No. CIV 04-218-FHS-KEW**
                               )
RON WARD, Warden,          )
                               )
         Respondent.     )

## REPORT AND RECOMMENDATION

NOW before the Magistrate Judge is petitioner's petition for a writ of habeas corpus. Petitioner, an inmate currently incarcerated at Davis Correctional Facility in Holdenville, Oklahoma, attacks his conviction in McCurtain County District Court Case Number CF-2001-124B for First Degree Murder. He sets forth the following grounds for relief:

    I.      Evidence presented at trial was insufficient to support the jury's verdict.

    II.    Trial court committed reversible error in failing to instruct the jury on Second Degree Murder and Manslaughter.

    III.   Ineffective assistance of trial counsel.

    IV.   Trial court committed reversible error in allowing multiple, cumulative, and highly prejudicial photographs to be admitted into evidence.

The respondent has submitted the following records to the court for consideration in this matter:

    A.    Summary Opinion affirming petitioner's Judgment and Sentence. *Garrison v. State*, No. F-2001-1453 (Okla. Crim. App. June 10, 2003).

    B.    Transcript of petitioner's jury trial, held on October 15-16, 2001.

    C.    Original Record in McCurtain County District Court Case Number CF-2001-124B

D. Transcript of petitioner's August 1, 2001, preliminary hearing.

E. Transcript of Gene Garrison's September 6, 2001, preliminary hearing.

F. Petitioner's brief on direct appeal.

G. The State's brief in petitioner's direct appeal.

H. Petitioner's application for evidentiary hearing, filed in his direct appeal.

Petitioner states in his petition that he has lost the documents from his direct appeal, so he has minimal supporting facts to allege in this habeas corpus petition. The court construes his pleadings liberally, *see Haines v. Kerner*, 404 U.S. 519 (1972), and will address his claims as raised in the direct appeal. The respondent has responded to the issues in this petition by referring to petitioner's direct appeal claims.

## Ground I: Sufficiency of the Evidence

Petitioner and his father Gene Garrison both were charged with the first degree murder of Yoshie Garrison, who was petitioner's mother and Gene's wife. (O.R. 1). Yoshie died from blood loss caused by four incised wounds. (Tr. 354, 358). Petitioner alleges in Ground I of this petition that the evidence presented at trial was insufficient to support his conviction.

In its Summary Opinion affirming petitioner's Judgment and Sentence, the Oklahoma Court of Criminal Appeals found the jury's verdict was supported by the evidence. *Garrison v. State*, No. F-2001-1453, slip op. at 2 (Okla. Crim. App. June 18, 2003) (citing *Spuehler v. State*, 709 P.2d 202 (Okla. Crim. App. 1985); *Jackson v. Virginia*, 443 U.S. 307 (1979)). The respondent asserts the OCCA considered and found no merit in this claim, and under the revised federal habeas corpus statutes, habeas corpus relief is proper only when the state

court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The record shows that on May 6, 2001, Janice Garrison called the Valliant, Oklahoma, police, concerned about her 74-year-old mother Yoshie Garrison. (Tr. 307-08, 352, 440-41). Yoshie lived with her husband Gene and her 40-year-old son John, the petitioner. (Tr. 446, 450). Janice went to her parents' home to talk to her mother about Yoshie's doctor's appointment. (Tr. 439). Janice became alarmed when she arrived at her parents' residence around 11:30 a.m. or 12:30 p.m., and the back door was locked. (Tr. 439). She knocked but was denied entry by her intoxicated father. (Tr. 435, 439-41).[1] Janice did not see petitioner. (Tr. 440).

When Valliant Police Department Chief Don Winship went to the Garrison residence around 12:10 p.m., petitioner came to the door with blood on his hands, sleeves, pants, and bare feet. (Tr. 308-09, 319). Winship inquired about Gene and Yoshie, and petitioner said they were all right. (Tr. 310). Petitioner was talking slowly and acting sleepy. (Tr. 338). He told Chief Winship that his mother had been up all night and was asleep. (Tr. 310). Chief Winship asked to see Gene and Yoshie, and petitioner led him inside, where he saw Gene reclining in bed. (Tr. 310, 312). The room was dark, but Winship thought he saw

---

[1] Valliant Police Chief Winship testified that Janice Garrison told him petitioner was the person who would not allow her into the home (Tr. 318).

some of Yoshie's hair sticking out from the bed covers. (Tr. 310).

Gene appeared to be intoxicated and said his wife was asleep. (Tr. 322-23). A light was on in the adjacent bathroom, where Winship saw an excessive amount of blood on the floor and the side of the bathtub, as well as bloody clothing on the floor. (Tr. 310). Without checking further on Yoshie, Winship took petitioner to the police station for questioning. (Tr. 311).

Petitioner had cuts on his wrists and feet, and he told Chief Winship they were self-inflicted with a razor blade. (Tr. 312). When asked about Yoshie's welfare, petitioner said, "She was alive last night." (Tr. 312). Realizing something was wrong, Chief Winship returned to petitioner's home with petitioner and Valliant Police Officer David Carrell. (Tr. 312-13).

The officers followed petitioner back into the house, where they saw what appeared to be blood on the floor. (Tr. 313, 395). Gene Garrison still was reclining on the bed, with his hands under his shirt, apparently holding a weapon under his pajamas. (Tr. 313, 327, 397). Officer Carrell went to Yoshie's side of the bed and pulled back the covers to check on her (Tr. 313). She had no pulse and was cold (Tr. 313). Gene then pulled his hands, which had blood on them, from under his shirt, and he was holding a large butcher knife. (Tr. 314, 399). He placed the knife against his stomach, threatened to just end it all, and angrily cursed the officers. (Tr. 314, 327, 397). Gene also said, "I--I cut her. I did it." (Tr. 399). Petitioner did not say or do anything in response to his father's statement. (Tr. 399). Gene also stated, "It'll all be over soon." (Tr. 400).

Chief Winship took petitioner outside, handcuffed him for the officers' protection, and put him in a patrol car. (Tr. 314, 329). Neither of the police officers told petitioner he was

under arrest for the murder of his mother. (Tr. 332, 407-08). Chief Winship came back inside the house where he and Officer Carrell were able to subdue, handcuff, and arrest Gene Garrison, who had cuts on his hands and feet. (Tr. 315, 403). Gene was weak and frail, so the officers had to physically lift him out of bed and assist him to a second patrol car. (Tr. 340, 401-04).[2]

Petitioner, who was in the other patrol car, motioned to Officer Carrell to come over. (Tr. 407). Petitioner then told Carrell, "David, I cut exactly where Daddy told me to." (Tr. 407). In his closing argument, the prosecutor stated, without objection, that the jury could infer that Gene advised petitioner where to cut not only himself, but also Yoshie. (Tr. 493).

The state criminalist testified she found Yoshie's body in a pool of blood, off the side of the bed, with her upper body on the bed, and her knees and legs on the floor. (Tr. 224, 227). Blood was in every room of the house, except the utility room and dressing room. (Tr. 226). There were bloody shoe prints and what appeared to be small barefoot prints, including a small, distinct footprint in the kitchen in front of the cookstove. (Tr. 229-31). Blood also was found on the sole of Yoshie's small foot. (Tr. 230). The criminalist admitted, however, that no prints were taken from the scene or submitted to the Latent Evidence Unit, partly because there was no evidence of an intruder. (Tr. 265-66, 274).

Two large knives with apparent bloodstains were found in Yoshie and Gene's bedroom. (Tr. 235-37). A third, smaller knife with apparent blood stains was in the kitchen sink. (Tr. 236-37, 240). A razor blade, also with apparent blood stains, was next to the bed

---

[2] Gene Garrison also was charged with First Degree Murder in Case No. CF-01-124A, but he died in February 2002, after petitioner's trial, but before his own trial could be held. *See* McCurtain County Dist. Ct. Case No. CF-01-124A, Docket Entry for 02/20/2002 at http://www.odcr.com.

in petitioner's bedroom. (Tr. 236). A recently-used whetstone was on the kitchen table, and an electric grinder, which could have been used for sharpening knives, was plugged in and sitting in the bathroom sink. (Tr. 242-43, 252). The bathroom, located between the two bedrooms, contained blood-soaked bath towels in a bucket. (Tr. 222, 252-53). The criminalist performed no tests for blood typing to determine whose blood was in different areas of the house, because she had been advised that the two men who lived in the house both had been bleeding that day. (Tr. 263-64). She testified, "[I]t was problematic as to which stains would have value to do any typing on, to try to identify them as opposed to any of the other stains in the house." (Tr. 264). Furthermore, the criminalist did not have any known DNA samples from the men, and she "did not see any one stain over the other that . . . had value as to determine exactly the scenario that had occurred." (Tr. 264-65). She did take samples, however, in case additional testing was required. (Tr. 265).

The forensic pathologist/medical examiner testified that Yoshie, who weighed only 97 pounds, had four transverse, incised wounds caused by a sharp object, most likely a knife. (Tr. 349, 353-56, 366). Two of the cuts were on her left arm, one was on her lower left leg, and the fourth was on her right foot. (Tr. 354-56). Because the multiple incised wounds involved only superficial veins, she bled to death over a period of one to seven hours. (Tr. 358, 373-74). Application of compression or bandages would have stopped the bleeding. (Tr. 370, 374, 387). She had no defensive wounds. (Tr. 361). Yoshie's death would have been considered a suicide, except for information from the investigator that petitioner and Gene were in the house. (Tr. 378-79). Valium was found in her system, but not in a quantity that would have caused her death. (Tr. 359-60).

Petitioner testified he only vaguely remembered the events, because he was

intoxicated on Valium and Xanax. (Tr. 451). On the day before he was arrested, his father gave him about $200.00 and told him to buy Valium. (Tr. 451-52). Petitioner knew his father was planning to give the pills to Yoshie, so he could kill her without causing her to suffer. (Tr. 482-83). Yoshie was being treated by a doctor for clinical depression, and she had talked about suicide. (Tr. 442). Petitioner testified his mother had said she was ready to go, and he helped her by purchasing the drugs. (Tr. 483). Petitioner bought fifty 2 mg. Xanax tablets and about fifty 10 mg. Valium tablets on the afternoon of May 5. (Tr. 451-53). When he returned home at about 4:00 p.m., petitioner ingested some Valium and Xanax, "and continued to relax and get high, and forget about all [his] problems." (Tr. 453). He gave the rest of the pills to his father, putting them on the night stand next to Gene's bed. (Tr. 454). Petitioner then went to his bedroom to listen to the radio and fight his drowsiness, so he could "enjoy the Valium high." (Tr. 454).

Petitioner further testified that when he went into his parents' bedroom, his father stopped him and said, "She's ready to go, and I'm ready to go." (Tr. 456). Yoshie was sitting in bed, looking directly at petitioner, but she did not say anything. (Tr. 455). Petitioner said his father then "talked about committing suicide, because he was terminally ill with cancer, and he did not want to deal with the pain anymore." (Tr. 455). Petitioner replied, "Dad, don't do it." (Tr. 457). By this time, petitioner was very drowsy and was having difficulty walking. (Tr. 457). The telephone was not connected, and petitioner testified he could not get help, because he was "so messed up on them Valiums I didn't even know what I was doing." (Tr. 457). Petitioner did not know whether his father was serious, and petitioner was so "messed up" that he had to lie down. (Tr. 457).

Petitioner admitted he did not make an effort to stop his father, because there already

was friction over petitioner's living there, and Gene would have kicked him out of the house. (Tr. 456, 470). Petitioner also claimed his father would have called the authorities and said that petitioner had mental problems, and petitioner would have been arrested. (Tr. 470).

Although he was uncertain about the time, petitioner stated he was in a deep sleep in his bedroom from about 6:00 p.m. until 9:00 or 10:00 p.m. (Tr. 459). When he woke up, he went into the kitchen to see if his father had followed through with his plan. (Tr. 460). He saw his mother slumped over the bed with her feet hanging off the side and thought, "Oh, my God, he's done went and did it." (Tr. 460). Petitioner stated he never saw his father cut his mother. (Tr. 460, 466). He saw a puddle of blood, and he could tell she was not breathing. (Tr. 461). He denied cutting or otherwise injuring his mother. (Tr. 451, 479).

When petitioner realized his mother was dead, he said he did not want to live any longer. (Tr. 460). He went into the kitchen and picked up a butcher knife from the table. (Tr. 461). The blade was rusty and dull, so he took a smaller steak knife that he found on the coffee table in the living room. (Tr. 461-62). He was so "messed up" he lost the steak knife and decided he had to use the butcher knife, but he needed to sharpen it. (Tr. 462). He asked his father where the whetstone was, but Gene did not know. (Tr. 462). Petitioner previously had told his father about his thoughts of suicide, and Gene said, "I think that's the best thing for you, son, because there won't be nobody here to take care of you when we're gone." (Tr. 462). Gene also suggested at that time that they all take tranquilizers and kill themselves. (Tr. 462). A day or two earlier, Gene told petitioner that Yoshie had purchased some razor blades. (Tr. 463).

Petitioner found the grinder and took it into the bathroom where the light was better. (Tr. 463-64). He sharpened the butcher knife and may have sharpened the other knives. (Tr.

464). Gene heard the grinder and came into the bathroom. (Tr. 464). Petitioner said he was ready to go, too, and began cutting himself with the knife. (Tr. 465). The butcher knife, however, was not sharp enough, so his father brought him a razor blade, probably from the parents' bedroom. (Tr. 465-66). Petitioner asked his father where he should cut himself, and Gene pointed out a vein on petitioner's arm. (Tr. 466). Petitioner then cut himself repeatedly with the razor blade, but there was no significant bleeding, because his veins had collapsed from intravenous drug use. (Tr. 467-68). Petitioner sat down on his bed, and his father spoke to him. (Tr. 469). Gene said, "She didn't suffer much, son. She went out pretty easy." (Tr. 469). Petitioner assumed his father had given his mother some of the pills to make her groggy and so she would not feel the cuts. (Tr. 469).

As for the large amounts of blood throughout the house, including the small footprint in the kitchen, petitioner claimed it was his, and at one point, he tried to increase his bleeding by taking a hot bath in the bathtub. (Tr. 473). The hot water did not significantly increase the bleeding, although the water turned blood red. (Tr. 473-74). He got out of the tub and let blood drain from his feet and hands into bucket in the bathroom. (Tr. 475). He also got blood on the floor. (Tr. 475). The clothes he had been wearing had blood all over them, so he walked to the laundry room to get fresh clothes, tracking blood throughout the house. (Tr. 474). Petitioner testified the blood in the bathroom, kitchen, dining room, living room, the door frame, and his bedroom all was his. (Tr. 475-78). He said the bloody footprint in the kitchen probably was his, too. (Tr. 478).

Petitioner realized he was not bleeding enough, so he went into his parents' bedroom and got the remaining Valium and Xanax tablets. (Tr. 470). He claimed he was in a state of shock from his mother's death and the realization he would have to leave home, he needed

another hip operation, and he would have to go to drug rehabilitation with a crippled hip. (Tr. 471). Still wanting to kill himself, he swallowed all the pills. (Tr. 472).

Because he did not have the knives sharpened, petitioner went across the street to Kenneth Asbill's home to get a sharp knife he could use to commit suicide by cutting a main artery. (Tr. 472). He wanted to get it over with, like his mother. (Tr. 472). His cuts no longer were bleeding, but he had blood on his hands. (Tr. 473). He asked Asbill for a sharp knife and to use the phone. (Tr. 472-73). He planned to get more pills and end it all. (Tr. 472-73). Asbill would not let him use the phone but offered to take him to a woman's house. (Tr. 473). Petitioner planned to have the woman give him a ride to get more pills, so he would not have to cut himself anymore. (Tr. 473). The woman would not get out of bed, so petitioner got back in Asbill's truck. (Tr. 473).

Kenneth Asbill testified that on May 6, 2001, at about 9:00 or 10:00 a.m., petitioner came to his house and asked to use the telephone. (Tr. 342-43). Asbill told petitioner that Mrs. Asbill still was in bed, so he would give petitioner a ride to another phone. (Tr. 343). Asbill noticed that petitioner's pants were about to fall off, and that petitioner had traces of blood on his arm. (Tr. 343). Asbill took petitioner to another house to use the phone, but no one answered the door. (Tr. 343, 345). Asbill offered petitioner a quarter for a pay phone, but petitioner declined the money and asked Asbill to take him home. (Tr. 343-45).

About 30 minutes or an hour later, petitioner returned to Asbill's house and asked for a "real sharp knife" to cut steaks. (Tr. 344). Asbill did not have a knife for him, so petitioner left. (Tr. 344). Asbill testified he saw the police at the Garrison residence about 30 minutes to an hour later. (Tr. 346).

Petitioner's sister Janice testified that petitioner was "pretty spaced out" when she saw

him at the police station. (Tr. 441). He denied cutting their mother. (Tr. 436). Janice further testified that her mother was clinically depressed and had talked about suicide. (Tr. 442).

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F. 2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court has repeatedly emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

The district court properly and without objection instructed the jury as to the elements

of Murder in the First Degree with Malice Aforethought:

> First, the death of a human;
> Second, the death was unlawful;
> Third, the death was caused by the defendant;
> Fourth, the death was caused with malice aforethought.

OUJI-CR(2d) 4-61 (O.R. 49). *See also* Okla. Stat. tit. 21, § 701.7. With respect to causation, the jury was instructed as follows:

> No person may be convicted of murder in the first degree unless his conduct caused the death of the person allegedly killed. A death is caused by the conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life. This conduct may be either an act or a failure to perform a legal duty to the deceased.

OUJI-CR(2d) 4-60 (O.R. 52).

The respondent maintains the jury easily could have found that petitioner caused his mother's death by his direct acts or by his failure to act. Although petitioner is claiming there was insufficient evidence because his fingerprints were not found on the knives, he testified at trial that he handled the knives when he tried to kill himself. (Tr. 461-62). The criminalist testified that no fingerprints were taken from the knives, because only Yoshie, Gene, and petitioner lived in the house, and it would not be unusual to find their fingerprints on household items. (Tr. 266-67). Furthermore, any bloody fingerprints would only indicate an individual had handled the knife, not whether that individual had used it as a weapon. (Tr. 294-95).

Petitioner claimed he was unable to get help for his mother, because there was no working telephone in the house. (Tr. 457). He also said he did not try to stop his father from killing his mother, because Gene would have kicked him out of the house and had him arrested. (Tr. 470). Yoshie bled to death over a period of one to seven hours when the

application of pressure would have stopped the bleeding. (Tr. 374). By petitioner's own admission, he failed to act to prevent his mother's death.

The respondent points out inconsistencies in petitioner's account. Petitioner's 17-year-old nephew Justin Bell testified he came to the house and saw petitioner in Gene and Yoshie's bedroom between 8:30 p.m. and 9:00 p.m. on May 5. (Tr. 204-05, 207). Justin saw his grandmother Yoshie, lying on the bed with her entire body covered, except for her feet, which were slightly hanging off. (Tr. 205). Petitioner was acting "weird," and appeared to be "coming off something." (Tr. 208-10). The nephew did not notice any blood on or around Yoshie. (Tr. 211). Justin's testimony contradicted petitioner's claim that he awakened at about 9:00 or 10:00 p.m. to find his mother dead in a pool of blood. (Tr. 459-61). Petitioner denied any recollection of the nephew's visit. (Tr. 457-58).

According to petitioner, the large quantities of blood in the house came from his self-inflicted wounds. (Tr. 473-78). Officer Carrell testified petitioner had minor cuts on his wrist and hands. (Tr. 393-94). When petitioner was booked into the jail, however, it was determined that his cuts warranted treatment, so Chief Winship took him to the hospital. (Tr. 315-16, 332-33). No forensic evidence was presented that showed whose blood was throughout the house.

The respondent also alleges Gene Garrison was too frail and ill to have masterminded this crime. According to testimony by petitioner and petitioner's nephew and sister, Gene was drunk the evening of May 5 and the next day. (Tr. 208, 340, 403-04, 439). The respondent argues that petitioner admits he provided the drugs to sedate his mother, and his statement in the patrol car that he "cut exactly where Daddy told me to" was an admission that he caused her fatal wounds. Petitioner maintained in his direct appeal that this statement

was a reference to his self-inflicted wounds, not to the wounds his mother suffered.

There are many unanswered questions in this case. First, it is remarkable that Police Chief Winship went to the Garrison home to check on Yoshie's welfare, saw her in bed, covered to the top of her head, and simply accepted the explanation that she was sleeping.[3] He did not report seeing any blood on Yoshie or the bed. When he returned to the home with Officer Carrell and petitioner, Gene was in bed with Yoshie's body, he had blood on his wrist and hands, he was holding a large butcher knife, and he admitted cutting Yoshie. Petitioner had been with Chief Winship until the return visit, yet petitioner was accused of causing the fatal injuries.

Petitioner had no history of harming his mother, and he denied cutting her. (Tr. 341, 436-37, 451, 479). Gene Garrison consistently admitted cutting Yoshie and never implicated petitioner. (Tr. 399).[4] There apparently was no attempt to determine the murder weapon. Because there was no blood typing or DNA testing, the question of whose blood was throughout the house went unanswered. The minimal and inadequate forensic work at the Garrison home provided absolutely no evidence that petitioner was responsible for his mother's injuries and death. Furthermore, none of the evidence refuted petitioner's claim that the blood in the bathroom and other parts of the house came from his failed attempts to kill himself with a knife or razor blade.

Although the respondent alleges petitioner failed in his legal duty to save his mother or to obtain help for her, no legal authority is cited for this claim. It is not disputed that, at

---

[3] The court also notes that Justin Bell, Yoshie's grandson, apparently did not find it unusual that she was lying in bed covered from her ankles to the top of her head. (Tr. 205).

[4] When Gene was booked into the jail, he told the jail supervisor that he "cut hisself [sic] right after he had cut his wife so she wasn't hurting anymore." (9/6/01 P.H. Tr. at 60).

his father's direction, petitioner obtained medication to sedate his mother. There is nothing in the record, however, to suggest petitioner administered the medication. He was not charged with a conspiracy to kill his mother or with aiding and abetting murder; he was, instead, charged with the act of murder.

Nonetheless, after careful review, the court finds the evidence was sufficient under the standard of *Jackson v. Virginia*. Interpreting petitioner's statement that he "cut exactly where Daddy told [him] to" as a reference to Yoshie's cuts, there was "some evidence" that petitioner caused his mother's fatal injuries. Therefore, Ground I of this habeas petition fails.

## Ground II: Jury Instructions

Petitioner next alleges the trial court erroneously failed to instruct the jury on Second Degree Murder and Manslaughter. The jury was instructed on the defense of voluntary intoxication (O.R. 54), but no instructions were requested or given for Second Degree Murder or Manslaughter. Petitioner argued on direct appeal that, while voluntary intoxication is not a complete defense to criminal culpability, it may be considered in determining whether the accused possessed the necessary criminal intent to commit the crime. Petitioner further asserted that the evidence of petitioner's voluntary intoxication served little purpose in defending against First Degree Murder, when the jury's only options were conviction or acquittal. The OCCA held, without explanation, that the evidence did not warrant the instruction on voluntary intoxication, and because petitioner "received a benefit to which he was not entitled," there was no need to address lesser included offenses. *Garrison*, No. F-2001-1453, slip op. at 2.

The respondent asserts this is an issue of state law which is not cognizable in federal habeas corpus.

> In a habeas corpus proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden. *Lujan v. Tansy*, 2 F. 3d 1031, 1035 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994). A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial. *Shafer v. Stratton*, 906 F.2d 506, 508 (10th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990). . . . "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). The degree of prejudice from the instruction error must be evaluated in the context of the events at the trial. *United States v. Frady*, 456 U.S. 152, 169 (1982).

*Maes v. Thomas*, 46 F. 3d 979, 984 (10th Cir.), *cert. denied*, 514 U.S. 1115 (1995). "Unless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process." *Tiger v. Workman*, 445 F.3d 1265, 1267 (10th Cir. 2006) (citations omitted).

> Oklahoma law provides for an instruction on voluntary intoxication only when a defendant presents sufficient *prima facie* evidence that he meets the legal criteria for the defense of voluntary intoxication. *Jackson v. State,* 964 P.2d 875, 892 (Okla. Crim. App. 1998). To satisfy the legal criteria, a defendant must actually be intoxicated and "be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime." *Id.* The OCCA has held that it belies a defense of voluntary intoxication for a defendant to have been sufficiently aware so as to be able to testify about events surrounding a murder. *See id.*

*Bland v. Sirmons*, 459 F.3d 999, 1030-1031 (10th Cir. 2006), *cert. denied*, ___ U.S. ___, 127 S.Ct. 2117 (2007). Accepting that the OCCA was correct in its determination that petitioner was not entitled to the defense of voluntary intoxication, the fact is that the jury actually was given this instruction. Consequently, the trial court was required to instruct on the lesser included offenses, regardless of whether such instructions were requested.

Voluntary intoxication is available as a defense when the *mens rea* element of the crime is a specific criminal intent or a special mental element. *Kreijanovsky v. State*, 706 P.2d 541, 544 (Okla. Crim. App. 1985) (citations omitted). Under Oklahoma law "the trial court has a duty to instruct upon lesser-included offenses supported by [the] evidence in homicide cases even though the instruction is not requested." *Walton v. State*, 744 P.2d 977, 978 (Okla. Crim. App. 1987) (citations omitted). *See also Hall v. State*, 698 P.2d 33, 39 (Okla. Crim. App. 1985); *see also Dawson v. State*, 647 P.2d 447, 449 (Okla. Crim. 1982) ("In a prosecution for murder, the court should instruct the jury on the law of each degree of homicide which the evidence tends to prove whether it be requested on the part of the defendant or not"). Defense counsel's request for the voluntary intoxication instruction shows he was not proceeding with an "all or nothing" approach. *See Shrum v. State*, 991 P.2d 1032, 1036-37 (Okla. Crim. App. 1999).

After careful review, the court finds that, when evaluated in the context of the entire trial, including the voluntary intoxication instruction, the trial court's failure to instruct on Manslaughter and Second Degree Murder prejudiced petitioner to the extent he was denied a fundamentally fair trial. *See Frady*, 456 U.S. at 169-70. Therefore, the OCCA's determination of this issue "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d).

**Ground III: Ineffective Assistance of Trial Counsel**

Petitioner alleged in his direct appeal that his appointed counsel failed to challenge the weakness of the State's case, and counsel failed to adequately cross-examine the State's witnesses, even when there were inconsistencies in testimony from the preliminary hearing and at trial. Petitioner claimed that his waiver of all objection to the improper search warrant

compounded this error.

Petitioner also asserted on direct appeal that defense counsel gave only a cursory preview of the instructions to the jury and used a good portion of his closing argument to bolster the State's case by emphasizing the credibility of the State's criminalist. He referred to her as a "qualified lady," despite her admission that she was not an expert in footprint analysis, her admission that she performed no tests on the blood samples from the Garrison home, and her testimony that the substance at issue only "could have been blood." (Tr. 237, 277, 497-98). A significant portion of defense counsel's closing argument was used to negatively characterize petitioner. For example, trial counsel told the jurors that "John Jackson Garrison is a person who has taken much more from this society than he has ever given; who has virtually wasted his life away." (Tr. 496). Defense counsel referred to "the John Jackson Garrisons of the world," while emphasizing to the jury how "pitiful" petitioner's life was. (Tr. 496-97).

Contemporaneous with his direct appeal brief, petitioner filed an application for an evidentiary hearing on his claim of ineffective assistance of trial counsel. The application alleged trial counsel failed to conduct a reasonable investigation which would have led to the discovery of critical mental health records supporting petitioner's inability to form the requisite intent for First Degree Murder. The OCCA found trial counsel was not ineffective and denied petitioner's application for an evidentiary hearing, "finding no clear and convincing showing that there is a strong possibility trial counsel was ineffective." *Garrison*, slip op. at 2 (citations omitted).

"There is a strong presumption that counsel provided effective assistance of counsel and petitioner has the burden of proof to overcome that presumption." *United States v.*

*Rantz*, 862 F.2d 808, 810 (10th Cir. 1988), *cert. denied*, 489 U.S. 1089 (1989) (citing *United States v. Cronic*, 466 U.S. 648, 658 (1984)). The United States Supreme Court has set forth the two-part test for determining the validity of a habeas petitioner's claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

### *Investigation, Witnesses, Cross-Examination, Instruction Preview, and Closing Argument*

Petitioner argued on direct appeal that defense counsel failed to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case. The only defense witnesses were petitioner himself and his sister Janice. Petitioner complained on direct appeal that counsel should have called petitioner's other two sisters to testify. Petitioner, however, did not articulate what the other sisters' testimony would have been. Regarding Janice's testimony, counsel asked her whether her father had talked to her about committing suicide with her mother. (Tr. 443). When the trial court sustained the State's objection on hearsay grounds, counsel made no attempt to rephrase the question in a manner which would have allowed her to testify about her knowledge of the alleged suicide pact. (Tr. 443-44). Again, petitioner has not produced any evidence of what Janice's testimony would have been, if she had stated her knowledge of the pact.

With respect to defense counsel's cross-examination of witnesses, his preview of the

instructions, and his closing argument, the court finds it is "easier to dispose of an ineffectiveness claim for lack of prejudice than to determine whether the alleged errors were legally deficient." *Davis v. Executive Director of Dep't of Corrections*, 100 F.3d 750, 760 (10th Cir. 1996), *cert. denied*, 520 U.S. 1215 (1997) (quoting *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993)). "To establish prejudice under *Strickland*, [petitioner] must show there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). With respect to these ineffective assistance of counsel claims, petitioner has failed to demonstrate prejudice. Therefore, with respect to petitioner's claims regarding these issues of alleged ineffective trial counsel, the court finds the OCCA's decision did not violate the standards of § 2254(d).

***Failure to Introduce Psychiatric History***

Trial counsel allegedly failed to investigate and present crucial evidence about petitioner's mental health issues, chronic drug abuse, and prior suicide attempts, which could have helped to explain his behavior surrounding his mother's death. In addition, exculpatory evidence that petitioner immediately was placed on suicide watch after his arrest was not presented. Counsel also failed to call petitioner's two other sisters and experts who had diagnosed petitioner's paranoid schizophrenia and chronic drug abuse.

Petitioner's competency to stand trial was at issue in this case, and on May 31, 2001, he was ordered to undergo a competency evaluation at the Carl Albert Mental Health Center. (O.R. 11-12). On June 4, 2001, a report was prepared, stating petitioner was competent to stand trial, but he had "a long history of being diagnosed with Schizophrenia, Paranoid

Type." (O.R. 13). Petitioner was not considered to pose a significant threat to the life or safety of himself or others, "[a]s long as he is compliant on psychotropic medication and does not drink or use illicit drugs." (O.R. 14).

Petitioner's Application for Evidentiary Hearing on Sixth Amendment Claim included an affidavit from Faust Bianco, Ph.D., a clinical psychologist in Tulsa, Oklahoma, who had reviewed petitioner's medical and psychiatric documentation. Dr. Bianco reported as follows:

> . . . Documentation from the medical records show John Garrison has been diagnosed, at different times previous to the time in question, with various psychiatric diagnoses which include: Schizophrenia, Paranoid Type; Depression, Not Otherwise Specified; Psychosis, Not Otherwise Specified; Alcohol and Inhalant Induced Persisting Dementia; Alcohol Dependence; Inhalant Dependence; and Polysubstance Dependence. Further, the record notes that Mr. Garrison suffered from a head injury and possible traumatic brain injury (the patient was in a coma for two days in 1976 resulting from a motor vehicle accident), and as a result of inhalant dependence and/or traumatic brain injury has decreased cognitive functionality related to memory problems, slowed information processing, attention and concentration problems and response latency issues. . . . [As part of a formal diagnosis by Dr. Makowski at Terrell State Hospital in 1998,] Mr. Garrison was evaluated as having a DSM-IV Global Assessment of Functioning of 40, which is defined as follows: "Some impairment in reality testing or communication or major impairment in several areas, work or school, family relations, judgment, thinking or mood." At that time the medical record stated, "Thought process: was very slow, with marked difficulty and delay in integrating, organizing, goal directing, and responding."

> . . . Mr. Garrison had been a psychiatric patient at Carl Albert Mental Health for 961 days starting on December 31, 1996. He was discharged on August 19, 1999, for only twenty days, and readmitted on September 8, 1999. He was evaluated on June 4, 2001, by Jim Dandridge, MBS, Idabel Satellite Supervisor-CACMHC, as Schizophrenic, Paranoid Type.

> . . . Paranoid Schizophrenia is a chronic condition which requires medication to maintain functionality. Noncompliance with medication leads to episodic decompression. The documents I reviewed demonstrate that Mr.

21

Garrison had not taken his medication for nearly two months before the incident in question. It is quite possible the patient may have decompensated into a psychotic condition, due to lack of psychotropic (psychiatric medication) intervention for his mental disorder(s).

Mr. Garrison has an extensive history of severe substance abuse. Specifically, he admits to inhaling paint fumes since childhood, injecting methamphetamine, and taking barbiturates in large quantities. In particular, Inhalant Dependence and Abuse are associated with possible organic brain damage with concomitant cognitive deficits and/or psychotic conditions. The longer one has used inhalants, the greater the possibility of organic brain damage.

In addition, Mr. Garrison had suffered a head injury as a result of a car accident that left him in a coma for two days. Traumatic brain injury, whether from head injury or organic brain injury from substance abuse has been associated with a vast array of cognitive and psychological changes including problems with memory, judgment, reasoning, information processing, speech --both expressive and receptive, executive functions like volition, initiation, motivation and decision making, to name only a few. Further, organic brain damage can be linked to or exacerbate personality dysfunction and various forms of acting out behaviors, bizarre behavior, and fully psychotic behavior.

In my review of the available transcripts of the trial, this neuropsychologist found no mention of Mr. Garrison's extensive mental health care, psychological status, or chronic mental illness issues by either the defense or prosecution. Expert testimony concerning these diagnoses may have supported the defense theory and would have facilitated the jury's understanding of Mr. Garrison's possible inability to form the intent required for first degree murder, as well as the jury's understanding of Mr. Garrison's passivity throughout the incident. It is possible that the jury may have considered his well documented significant chronic illness and compromised psychological status as factors leading to a different conclusion in their determination of Mr. Garrison's culpability, possibly leading to a different consequence in his case.

I am willing to appear in court and testify under oath to the above information. . . .

*Garrison*, No. F-2001-1453, Appellant's Application for Evidentiary Hearing on Sixth

Amendment Claim with Brief in Support, Exhibit A at 1-2 ("Evidentiary Hrg. App.").

Petitioner's medical records from Terrell State Hospital in Terrell, Texas, also include his following history:

On June 12, 1998, a Writ of Commitment, No. 0341, was issued for petitioner in Lamar County, Texas, committing him to Terrell State Hospital in Terrell, Texas, because he was suicidal and at risk for hurting himself. Evidentiary Hrg. App., Exhibit B at 13. Upon his arrival at Terrell, he gave a history of taking psychiatric medications from MHMR for more than four years. *Id*. at 2. When he could not get all his medications, he became frustrated and went to the emergency room at St. Joseph's Hospital for relief from anxiety. *Id*. He threatened to kill himself if not given medications to stop voices. *Id*. He was kept overnight and then sent to Terrell. *Id*. He later said he was lying about the voices and just wanted the medications to get past his situation. *Id*. He also talked about wanting SSI for hip surgery. *Id*. at 2, 4.

The physician at Terrell prescribed Zoloft and Haldol for the depressive component of petitioner's schizoaffective disorder, for his thought disorder, and for possible agitation and anxiety. *Id*. at 5. Neurological and psychological testing were needed to evaluate his cognitive brain, in light of his history of inhalants and of a concussion resulting in a two-day coma. *Id*. at 6. He also was seen as somewhat manipulative and demanding when he could not get what he wanted from MHMR or the emergency room. *Id*. On June 22, 1998, the Haldol was discontinued, and he was prescribed Prolixin D injections every two weeks to control his symptoms. *Id*. at 7, 8. Petitioner was discharged on July 2, 1998, because he had reached the maximum benefit from inpatient hospitalization and was not an imminent danger to himself or others. *Id*. at 9. The discharge summary stated he would be living with his parents in Valliant and receiving follow-up treatment at the mental health treatment clinic in

23

Idabel, Oklahoma. *Id.* The pre-sentence investigation after petitioner's conviction stated that petitioner received his medications from Carl Albert Mental Health Center, but he stopped going to the clinic after March 9, 2001. Evidentiary Hrg. App., Exhibit C, Pre-Sentence Report at 6. Petitioner's mother died less than two months later.

After petitioner was arrested, he was taken to the McCurtain Memorial Hospital Emergency Room. Evidentiary Hrg. App., Exhibit D. The ER Triage Primary Nursing Assessment stated that petitioner presented with cuts to his wrists and ankles and with "severe mental illness." *Id.* at 3. The Nursing Documentation stated that petitioner had 11 wounds on his wrists and ankles. *Id.* at 4-5. The lacerations ranged from a from a 2½ cm. cut to 11x2 cm. gaping wound with exposed fascia. *Id.* His injuries also included three other gaping wounds, measuring 4½ cm., 5x1 cm., and 6 x 1½ cm. *Id.* All his wounds were cleaned, steri-stripped, if required, and wrapped with dressing. *Id.* Petitioner constantly asked for pain medication. *Id.* His speech was "very slurred and hesitant," and his affect was flat. *Id.* at 5. The McCurtain County jailer was advised to expect petitioner's wounds to bleed. *Id.*[5]

> The proper measure of attorney performance is that of reasonably effective assistance under prevailing professional norms, considering all of the surrounding circumstances. *Strickland*, 446 at 687-88. The Court has been crystal clear that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*

---

[5] Although not raised on direct appeal, the court notes that counsel did not present any medical evidence of the severity of petitioner's lacerations, which could have supported petitioner's testimony that much of the blood was from his attempt at suicide. Instead, counsel allowed the police officers' testimony that petitioner's injuries were "just minor cuts" (Tr. 393) that probably would "need a stitch or two" (Tr. 333) to stand unopposed.

at 689. For that reason, a reviewing court must "reconstruct the circumstances of counsel's challenged conduct [and] evaluate [that] conduct from counsel's perspective at the time." *Id.*; *see also id.* at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). Because of the difficulties that inhere in such a process, "a court must indulge a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689 (emphasis added). The importance of this presumption cannot be overstated. This is made clear by the Court's repeated invocation of the "strong presumption" that counsel provided constitutionally adequate assistance. *See id.* at 690 ("[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."); *id.* at 696 ("In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.").

*Bryan v. Mullin*, 335 F.3d 1207, 1217 (10th Cir. 2003).

With this stringent standard in mind, the court finds that trial counsel's performance with respect to presenting petitioner's mental health history did fall below the constitutional requirements of *Strickland*. Without explanation, counsel failed to present any evidence of petitioner's lengthy psychiatric history and history of drug abuse and attempted suicide. Petitioner's symptoms, diagnoses, mental health treatments, hospitalizations, and his discontinuance of psychotropic medications could have explained his mental state and his behavior at the time of the murder. The psychiatric evidence also could have supported a defense that he was unable to form the requisite intent for First Degree Murder. In addition, counsel failed to present medical evidence from the hospital emergency room records noting that petitioner presented with "severe mental illness" when he was treated for his lacerations.

After careful consideration, the court finds trial counsel's performance fell below an objective standard of reasonableness, and counsel's failure to present this evidence

prejudiced the defense to the point that the court's confidence in the outcome of the trial is undermined. *Strickland*, 466 U.S. at 686-88, 694. This court, therefore, finds the OCCA's decision on petitioner's claim that trial counsel was ineffective in failing to investigate and present evidence of petitioner's psychiatric history was not in conformance with federal law, pursuant to 28 U.S.C. § 2254(d).

### *Failure to Object to Prosecutor's Cross-Examination of Petitioner*

At the conclusion of the State's cross-examination of petitioner, the prosecutor and petitioner had the following exchange:

> Q.      Mr. Garrison, you're charged jointly with your daddy, together. The hand that held the knife, with your aiding him and helping him, might as well be yours. Do you see that now, sir?
>
> A.      Uh-huh.

(Tr. 483).

Defense counsel made no objection, possibly leaving the jury to believe that petitioner was not required to be the actual killer to be convicted, or that petitioner could be convicted for First Degree Murder if he aided and abetted his father in killing Yoshie. Defense counsel's failure to object was compounded by the prosecutor's closing argument, again without objection:

> You can rest assured, ladies and gentlemen, that that man is responsible for his mother's death. Now he may be able to say, and he did in front of you, that he may not have held the knife that cut her and caused her to bleed to death, but in front of you he did recognize and finally assume responsibility. He stood up for one time in his life, like a man, and recognized his responsibility for her death in front of you folks in here this afternoon.

(Tr. 507-08).

This issue was not raised in petitioner's direct appeal, and probably would be

26

considered waived by the OCCA in a post-conviction action. *See* Okla. Stat. tit. 22, § 1086. This court notes, however, that in the event of a retrial, defense counsel must be vigilant in seeing that the jury is not misled about the elements of the charged crime.

## Ground IV:  Photographic Evidence

Finally, petitioner alleges the trial court abused its discretion in allowing multiple, cumulative, and highly prejudicial photographs of the victim and the house to be published to the jury. The OCCA found no error in admission of the crime scene and victim photographs. *Garrison*, slip op. at 2.

> Federal habeas review is not available to correct state law evidentiary errors; rather it is limited to violations of constitutional rights. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). . . . [The issue] is whether the admission of the photographs rendered the proceedings fundamentally unfair. *See Jackson v. Shanks*, 143 F.3d 1313, 1322 (10th Cir. 1998) ("[D]ue process arguments relating to the admissibility of the victims' . . . autopsy photos . . . will not support habeas relief 'absent fundamental unfairness so as to constitute a denial of due process of law.'" (quoting *Martin v. Kaiser*, 907 F.2d 931, 934 (10th Cir. 1990)), *cert. denied*, 525 U.S. 950 (1998); *Woods v. Johnson*, 75 F.3d 1017, 1038-39 (5th Cir. 1996) (stating admission of photographs of deceased's body does not violate Eighth Amendment unless it renders the trial fundamentally unfair). . . .

*Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999), *cert. denied*, 531 U.S. 833 (2000).

During the testimony of the State's criminalist, the trial court requested and was granted admission of multiple photographs of the victim and the blood throughout the Garrison home. The trial court *sua sponte* made a record concerning the "cumulative" and "possibly overly gruesome" nature of the photographs and noted that defense counsel had not objected to the photographs. (Tr. 256). Trial counsel admitted that they were "getting

27

to the point where it's going to be cumulative," agreeing with the court. (Tr. 257). Defense counsel, nonetheless, raised no objection, stating that, "I understand that those that depict blood and injuries, and . . . for the reason that I can use some of those photographs in my cross examination." (Tr. 257).

After careful review, the court finds that while the photographs were unpleasant, given the gruesome nature of the crime, the pictures were probative of the method of the victim's death, and were "not so unduly prejudicial as to render the proceedings against petitioner fundamentally unfair." *See Smallwood*, 191 F.3d at 1275 (citing *Jackson*, 143 F.3d at 1322. Consequently, the determination by the OCCA on this issue was consistent with federal law, and petitioner is not entitled to relief on this ground.

**ACCORDINGLY**, the Magistrate Judge finds that Ground II, failure to instruct on Second Degree Murder and Manslaughter, and one claim in Ground III, counsel's ineffectiveness in failing to investigate and present petitioner's mental health history, warrant habeas corpus relief. The Magistrate Judge further finds the remaining issues raised in this petition do not present a basis for habeas corpus relief.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given ten (10) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this <u>20th</u> day of July 2007.

_Kimberly E. West_

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE